Decided 21 December, 1903.

## STATE *v.* MILLER.

[74 Pac. 658.]

CRIMINAL LAW — PHOTOGRAPHS AS EVIDENCE.*

1. Although photographs of persons, places, or things are sometimes admitted as evidence, they are never competent unless necessary in some matter of substance, or instructive in establishing material facts or conditions, which was not. the case here where all the facts sought to be shown by the photographs could have been established by oral testimony.

IDEM.

2. To be admissible as evidence even under appropriate circumstances photographs must be correct representations of the subjects or conditions intended to be thereby presented.

CROSS-EXAMINATION OF AN ACCUSED.

3. Under B. & C. Comp. § 1400, authorizing the cross-examination of one accused of crime on all facts to which he testified in chief, tending to his conviction or acquittal, where one accused of murder related the circumstances leading up to the difficulty, and to his presence on the premises of the deceased, cross-examination was permissible to show that accused had been ordered off the premises by the deceased about two months previous to the killing, and that they were not on good terms, since these matters tended to show the feelings of the parties toward each other.

CROSS-EXAMINATION — BROWBEATING A WITNESS.

4. Cross-examination that does not elicit material information and tends to humiliate or bully a witness should not be permitted.

INSTRUCTION SHOULD BE BASED ON THE EVIDENCE.

5. Instructions stating correct propositions of law but not appropriate to the evidence in the case should not be given, as they tend to confuse the minds of the jury.

RIGHT OF SELF-DEFENSE — RELIANCE ON APPEARANCES.

6. Though in fact there is no actual necessity for taking life, yet the right of self-defense may be exercised if the person assailed has reasonable ground to be-

*NOTE.— See monographic note, Photographs as Evidence, with the cases of *Baustian* v. *Young*, 75 Am. St. Rep. 468-479, and *Dederichs* v. *Salt Lake C. R. Co.* 35 L. R. A. 802-815.— REPORTER.

lieve, and in good faith actually does believe, from the surrounding conditions, that death or the infliction of great bodily harm is imminent.

CONFLICTING INSTRUCTIONS AS ERROR.

7. The giving of directly contradictory instructions on a vital question in a case constitutes reversible error, for a charge of that kind cannot be construed into a harmonious and correct statement of the law involved. For example, a charge that unless the necessity for taking life is actual, present, and urgent, a defendant cannot invoke the doctrine of self-defense, is entirely inconsistent with an instruction that defendant has a right to act on appearances if he acts in good faith, and the jury cannot get from such a charge a correct idea of the rights of the defendant.

From Harney: MORTON D. CLIFFORD, Judge.

The defendants George S. Miller and James Colwell were jointly indicted with Bert Bailey for the murder of Joseph Warren Curtis, and convicted of murder in the second degree; Bailey having been discharged from the indictment during the progress of the trial. Briefly, there was evidence tending to show that shortly prior to the homicide Curtis had driven off the range a number of horses (among them a mare and colt claimed by defendant Miller), and at the time had the colt in a corral upon his premises; that, on being advised of the fact by his codefendant Colwell, Miller went to the Narrows, fifteen to eighteen miles distant from his home, and near the residence of Curtis, where he was informed that the latter forbade him from coming upon his place; that he then took counsel over the telephone with an attorney at Burns, for the purpose of ascertaining his legal rights in the premises, and was advised that he could replevy the colt or take it wherever he found it, provided he was able to do so without committing a breach of the peace; that he, Bailey, and Colwell left the residence of the latter about 8 o'clock on the evening of March 22, 1902, gathering up several gentle horses on the way and taking them along, intending to turn the colt out of the corral and drive it away with them; that, to reach the corral, they cut an outer wire inclosure of Curtis', a third of a mile or more distant, Miller going ahead; that, when they had gone about half the distance to the corral,

Curtis ordered Colwell and Bailey to take the horses off of his premises, and that they drove them back; that Miller was not aware of what had been done, nor of the presence of Curtis, until he came near the corral; that Curtis was armed with a 22-caliber rifle, and the defendant with a shotgun; and that several shots were fired, resulting in the death of Curtis. The killing is admitted, but defendants seek to justify it as an act of self-defense.

REVERSED.

For appellant there was a brief over the name of *Weatherford & Wyatt*, with an oral argument by *Mr. James K. Weatherford*.

For the state there was a brief over the names of *Andrew M. Crawford*, Attorney-General, *William Miller*, District Attorney, and *Thornton Williams*, with an oral argument by *Mr. Crawford*.

MR. JUSTICE WOLVERTON, after stating the facts in the foregoing terms, delivered the opinion.

1. At the trial, three photographs of the deceased, showing the gunshot wounds, were offered and admitted in evidence over the objection of defendants. This constitutes one of the assignments of error. One of the photographs shows shot wounds on the upper part of the left breast, about the shoulder clavicle, and neck; and the other two portray numerous wounds of the same nature upon the back and left side. The purpose of introducing them was to show thereby the number of shots discharged upon the person, and that two of them took effect from the side or rear, in order to discredit Miller's statement that he fired all the shots while Curtis was shooting at him. McMullen, who took the photographs, testified that they were as correct as any that could be taken under the circumstances, and considering the condition of the light in the room. Dr. Marsden, after minutely and particularly

describing the wounds found upon the body, further tes-
tified that the photographs represented their true char-
acter as nearly as could be done by the process, but that
they were not exact reproductions, in that they failed to
indicate the oblique appearance of some of the wounds on
the upper part of the chest. Photographs, when admitted
in evidence, should be shown to be correct representations
of the conditions existing, or of the subject sought to be
verified by the artificial view presented. Whether, how-
ever, the preliminary proofs in this regard are sufficient
upon which to allow them to go to the jury, is a matter
largely within the sound discretion of the trial court:
*Blair* v. *Pelham*, 118 Mass. 420 ; *Verran* v. *Baird*, 150 Mass.
141 (22 N. E. 630) ; *Harris* v. *Quincy*, 171 Mass. 472 (50
N. E. 1042); *Church* v. *Milwaukee*, 31 Wis. 512.

2. There is a limit, however, to the use of photographs
as evidence, and, while they are competent for some pur-
poses, they are not competent or appropriate for all. Gen-
erally, they may be used to identify persons, places, and
things ; to exhibit particular locations or objects where it
is important that the jury should have a clear idea thereof,
and the situation may thus be better indicated than by
the testimony of witnesses, or where they will conduce to
a better or clearer understanding of such testimony. They
may also be employed to detect forgeries, and to prove
documents where the originals cannot be readily produced.
But unless they are necessary in some matter of substance,
or instructive to establish material facts or conditions, they
are not admissible, especially when they are of such a
character as to arouse sympathy or indignation, or to
divert the minds of the jury to improper or irrelevant
considerations: *Baxter* v. *Chicago & N. W. R. Co.* 104 Wis.
307 (80 N. W. 644); *Selleck* v. *City of Jonesville*, 104 Wis.
570 (80 N. W. 944, 47 L. R. A. 691, 76 Am. St. Rep. 892);
*Fore* v. *State*, 75 Miss. 727 (23 South. 710). The photo-

graphs here introduced were wholly unnecessary as proof of the number of shots fired, or the direction from which they were discharged, as it respects the person of the deceased. Nor did they serve to elucidate or to explain the testimony of the witnesses in the case. The shot wounds were distinctly visible upon the body, where also could be seen the direction from which they took effect, and all conditions attending them were susceptible of being established in the ordinary way by the testimony of the witnesses who had occasion to observe and examine them, so that photographic representations of the appearance of the body were neither necessary nor instructive for indicating the existing conditions. Beyond this, the pictures were not faithful reproductions, as one witness testified that they did not show the oblique character of some of the wounds, and they presented a gruesome spectacle of a disfigured and mangled corpse, very well calculated to arouse indignation with the jury, and were manifestly harmful instrumentalities for use as evidence against the defendants, without being useful, in a legitimate sense, for the state. There was error, therefore, in permitting them to go to the jury.

3. Colwell, as a witness for the defense, related in detail the circumstances leading up to the difficulty resulting in the homicide from the time the colt was last seen upon the range, which tended to show, among other things, that he first discovered the animal in Curtis' possession upon his premises, and communicated the fact to Miller; that the latter came to his place, and, with Bailey, they went to the premises of deceased for the purpose of regaining possession of the colt, thus continuing the narrative attending their mission, indicating the motives that induced such action on their part. Upon cross-examination he was asked by the district attorney if he said anything to the deceased about the colt, and answered in the negative. It was then

developed, over objection, that he and the deceased had
had some difficulty; that at one time, a couple of months
or so prior to the homicide, he ordered deceased off of his
premises; that they were not on very good terms; and
that he knew the deceased had warned Miller not to come
upon his place unless he came with an officer. The objec-
tion urged was that the cross-examination which developed
these matters was not proper, the witness being a defend-
ant in the cause. The state had a right to examine the
witness upon all facts to which he had testified in chief,
tending to his conviction or acquittal: B. & C. Comp.
§ 1400. There has been much discussion as to whether
the witness, under this statute, does not occupy the same
position as any other witness, and whether the cross-ex-
amination may not be equally as broad and searching. It
may now, however, be considered as settled in this state
that he does not, and that his cross-examination should
be confined to the facts or matters concerning which he
has testified in the first instance. The statute, however,
is not to receive an unduly restricted or narrow construc-
tion, and the cross-examination must extend the inquiry
to facts and matters manifestly germane and relevant to
the facts testified to in chief, tending to their explanation
and elucidation, and in this respect may be as searching
and broad as the foundation upon which it rests: *State* v.
*Abrams,* 11 Or. 169 (8 Pac. 327); *State* v. *Saunders,* 14 Or.
300 (12 Pac. 441); *State* v. *Bartmess,* 33 Or. 110 (54 Pac.
167); *People* v. *O'Brien,* 66 Cal. 602 (6 Pac. 695); *People* v.
*Rozelle,* 78 Cal. 84 (20 Pac. 36). The inquiry here by the
state did not exceed the bounds. The purpose, no doubt,
was to test the motive that actuated the parties in going
to the premises of the deceased. If there was an ill feel-
ing between the witness and the deceased, this would serve
to throw some light upon the question; and it was there-

fore germane and relevant to the inquiry in chief, and consequently competent.

4. The cross-examination of the defendant Miller of which complaint is made was of a similar nature, and we are not prepared to say that the court erred in permitting it. Some questions were propounded, however, which it seems to us were caustic, and might as well have been omitted. It was drawn out of the witness that he took a shotgun and some shells with him, and that he did not get the colt. Then followed these interrogatories: "You did get a man?" "You did get a human life, didn't you?" "You got a human life, didn't you?" Again, after the witness had stated that about the time he fired the last two shots he heard Mrs. Curtis, wife of the deceased, scream, these questions were propounded, and he was required to answer them, namely: "Did she scream like a woman?" "Like a woman whose husband was being murdered?" Inquiries of the kind are calculated to badger and browbeat the witness, without serving to elicit any fact valuable to the controversy; and, while we are unable to say that there was an abuse of discretion, we cannot approve such a method in practice.

5. The court, at the request of the state, gave the following charge to the jury, to wit:

"It is not always that the danger should be real, in order that a person may justify on the ground of self-defense, but if the defendant, acting as a reasonable man, had reason to believe and did believe that his life was in danger, or in danger of great bodily harm, at the hands of deceased, and, acting upon such belief, took the life of the deceased, such an act on his part will be justifiable, although it might afterward appear that there was in fact no real danger."

After an intervening instruction, the court continued:

"I charge you that it is a well-settled principle of law that in an altercation, where one is assaulted, and then retreats to a place of safety, he has no right to arm himself

with a deadly weapon and renew the combat, when he has a reasonable opportunity to escape ; and if he does so he becomes the aggressor, and if, in the conflict that ensues, death results, he cannot claim to have acted in self-defense.

"I charge you further that the right of self-defense does not imply the right of attack, and will not avail in any case when the difficulty was induced by the party himself.

"The law regards human life as the most sacred of all interests committed to its protection, and there can be no successful setting up of self-defense unless the necessity for taking life is actual, present, and urgent — unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life, or his person from great bodily harm."

The defendants complain of these three latter instructions as prejudicial. The first of them was not called for under the testimony of the case, as disclosed by the bill of exceptions. There was no evidence tending to show that the defendant retreated to a place of safety after having been assailed by the deceased, or that he thereafter armed himself and renewed the conflict, and it was therefore improperly given. The second contains, perhaps, a sound principle of law, in the abstract, but it was inapplicable in the relation in which it was announced.

6. The gravest error, however, was committed in giving the third of these latter instructions. The jury were told thereby that unless the necessity for taking the life of the deceased was actual, present, and urgent, there could be no successful setting up of self-defense. This wholly eliminates the well-established qualification or element of the rule that a person assailed may act upon appearances, and that if he has reasonable ground to believe, and in good faith does believe, from the conditions present, that death or the infliction of great bodily harm is imminent, although the danger may subsequently prove not to have been real or actual, his act in taking the life of the aggressor will also be justifiable. A citation of authorities to this statement

of the law is scarcely necessary, but see *Goodall* v. *State*, 1 Or. 334, 338 (80 Am. Dec. 396); *State* v. *Morey*, 25 Or. 241 (35 Pac. 655); *State* v. *Porter*, 32 Or. 135 (49 Pac. 964); *State* v. *Gibson*, 43 Or. 184 (73 Pac. 333).

7. Nor does the instruction first herein noted, announcing the correct rule as to the right of the accused to act upon appearances, cure the error. The instructions are not only wholly disconnected in context, but are in direct conflict, so that they cannot be read together as a harmonious and correct statement of the principle of law involved : *People* v. *Gonzales*, 71 Cal. 569 (12 Pac. 783); *Perkins* v. *State*, 78 Wis. 551 (47 N. W. 827); *State* v. *Keasling*, 74 Iowa, 528 (38 N. W. 397). For these errors the judgment of the trial court must be reversed, and a new trial ordered.

Instructions Nos. 1, 3, 4, and 5 asked by the defendants and refused, of which complaint is made, were none of them proper, in the form submitted. Other errors are also assigned, but, as the questions involved will probably not arise upon a retrial, we deem it unnecessary to consider them now.                              REVERSED.

---

Decided 13 July, rehearing denied 5 October, 1903.